IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LASHANNON J. EASTON,           :        CIVIL ACTION
                               :        NO. 02-3695
         Plaintiff,            :
                               :
     v.                        :
                               :
BRISTOL-MYERS SQUIBB COMPANY   :
         and                   :
BRENDA MARTINI WAKIN,          :
                               :
         Defendants.           :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        OCTOBER    , 2003


        Plaintiff Lashannon Easton ("Ms. Easton") is an
African-American female.  Defendant Bristol-Myers Squibb Company
("BMS") is an international manufacturer of pharmaceutical and
related health products.  Ms. Easton was employed by BMS from
April 2000 to June 2001 as a Territorial Business Manager ("TBM"
or sales representative) and was assigned to the Brandywine
District.  Defendant Brenda Martini Wakin ("Ms. Wakin") was the
Regional Business Director ("RBD") responsible for BMS's
Brandywine District during Ms. Easton's employment at BMS.

        Ms. Easton claims that she was unlawfully discriminated
against by BMS on account of race during the course of her
employment.  Ms. Easton also claims that Ms. Wakin made certain
defamatory statements about her.  BMS denied that it
discriminated against Ms. Easton on account of race and that, in

any event, any claims are barred by a release that Ms. Easton executed for consideration at the time she resigned her employment at BMS.  Ms. Wakin asserts that she not did make the statements claimed and that, in any event, any statements made about Ms. Easton are protected by a conditional privilege which she did not abuse.

Defendants BMS and Ms. Wakin have moved for summary judgment.  The court finds that Ms. Easton executed the General Release for consideration knowingly and willfully and, therefore, the release is valid and enforceable barring all federal and state claims which accrued before the release was executed. Therefore, summary judgment is appropriate in favor of BMS and Ms. Wakin and against Ms. Easton on all federal and state claims.

I.   FACTUAL BACKGROUND[1]

Ms. Easton was employed by BMS as a TBM from April 2000 to June 2001.  Her duties included traveling within her assigned territory promoting BMS's products to doctors and other healthcare professionals.  To facilitate performance of her duties, Ms. Easton was entitled to charge business expenses to a corporate BMS American Express credit card.

Soon after her employment began at BMS, certain

---

[1] The facts set forth below are either uncontested or are viewed in the light most favorable to Ms. Easton.

2

disputes arose between Ms. Easton and BMS management concerning

Ms. Easton's use of her American Express credit card for personal

charges and her failure to reimburse BMS for these charges.[2]

---

[2] The dispute is complicated with each side pressing a
different version of the story.  BMS claims that Ms. Easton
abused her credit card privileges by charging personal items on a
business expense account in violation of BMS policy.  Ms. Easton
generally denies that she violated any company policy although
she concedes that some personal items were charged on her
American Express credit card.  The dispute is further complicated
by BMS's claim that it learned after Ms. Easton was hired that
Ms. Easton had also charged personal items to a company credit
card account while employed by another pharmaceutical company and
that the charges were still unpaid and outstanding.  Moreover,
BMS claims that it received a background report, which indicated
that Ms. Easton had been convicted of a felony theft charge in
Kentucky.  Ms. Easton has denied the felony conviction (although
she admits a misdemeanor plea) and does not address in her
summary judgment papers at all the allegation concerning her
conduct while at the other pharmaceutical company.  BMS contends
that its actions in connection with Ms. Easton's American Express
account including whatever scrutiny its management team placed on
Ms. Easton's account and the disciplinary probation program it
offered her were legitimate.  Ms. Easton contends that BMS's
scrutiny against her and the probation program were the product
of unlawful racial discrimination.

The court need not resolve which party's version of the
events is correct or whether Ms. Easton had, at the time she
signed the General Release, a valid discrimination claim against
BMS because, regardless of the merits of her claim, the parties'
agreed to settle their claims _inter se_ under an agreement.  Ms.
Easton received an additional eight weeks of severance pay based
on her regular pay rate and, in exchange, BMS received a release
that barred future litigation stemming from Ms. Easton's
employment at BMS.  Whether upon further reflection, Ms. Easton
concluded that she did not enter into a good business deal in
signing the release and thus wishes to renegotiate the terms of
the release, does not provide the court with a basis to second
guess the party's decision so long as the release was executed
"knowingly and willfully."

As a result of this dispute, on or about October 30, 2000, a recommendation was made by Mr. Tom Matayas ("Mr. Matayas"), one of Ms. Easton's immediate supervisors, to Ms. Wakin that Ms. Easton be placed on probation. However, on December 1, 2000, before BMS could implement the probation, Ms. Easton requested and was granted short term disability leave for six months.

On June 5, 2001, upon return from her disability leave, Ms. Easton was placed on probation for a period of 30 days because of her alleged prior credit card policy violations.  The terms of the probation were outlined in a letter dated June 5, 2001 from Mr. Charles Roseboro ("Mr. Roseboro"), who was acting DBM in place of Mr. Matayas at that point in time.  Under the terms of the June 5, 2001 letter, Ms. Easton was required to repay the amount that she owed to BMS ($289.06 total for a draft of $93.27 that was cashed in July of 2000 and a draft of $195.79 that was cashed in November 2000), to provide documentation of the reimbursement she claimed that she had already made to BMS, and to adhere to BMS's policy on the use of the American Express credit card in the future. During the probationary period, Ms. Easton was ineligible for salary increases or participation in any bonus plans, sales contests, or travel awards.

More importantly, the June 5, 2001 letter offered Ms. Easton, in lieu of probation, the option of resigning and

4

accepting four weeks severance pay at her pay rate.  Ms. Easton

was advised that she had three days within which to accept the

option of resigning in lieu of probation.  Further, the letter

explained that, if she chose the severance package, Ms. Easton

would have twenty-one days to decide whether or not to sign a

release.  If she did sign the release, Ms. Easton would receive a

supplemental severance package consisting of an additional eight

weeks of severance pay.  If she declined to sign the release, she

would still receive the "basic" severance package.[3]

---

[3] The body of the June 5, 2001 letter from Mr. Roseboro to
Ms. Easton provides:

> In May, 2000, you signed the American Express
> Corporate Card Account agreement to obtain a
> BMS Corporate American Express Card.  By
> signing this document, you agreed that the
> BMS Corporate American Express Card would be
> used ". . . only for legitimate expenses
> incurred in the course and for the benefit of
> my work for BMS."  A copy of this document is
> attached.
>
> On July 22, 2000, a memo was written to you
> which reinforced the expectation that the
> Corporate American Express Card should be
> used only for business expenses, except in
> the case of a personal emergency.  A copy of
> this memo is also attached.  Since then, you
> have continued to use the card for personal
> charges as is evident on you August and
> September American Express statements.
>
> On October 26, 2000, a meeting took place
> with Brenda Martini Wakin to review your
> American Express bills from May through
> August which you verified, had numerous
> personal charges which you agreed to pay.
> You also agreed to provide documentation of

your payment to BMS of your personal charges.
Brenda indicated this documentation must be
sent by October 31, 2000 via Federal Express,
so that the package could be traced if lost.
You then voice mailed Brenda to tell her it
would be provided late, but would arrive by
November 10.  Brenda again indicated it
needed to be sent via Federal Express.  To
date, June 5, 2001, no such documentation has
been received by the Regional Office.

Additionally, $289.06 is still owed to
Bristol-Myers Squibb.  This amount is for two
drafts that were cashed; $93.27 in July of
2000 and $195.79 cashed on November 29, 2000.
These amounts were debited back to Bristol-
Myers Squibb due to your account aging to 60
days past due.  Arrangements must be made to
reimburse Bristol-Myers Squibb immediately.

As a result of your continued disregard for
the expectations set forth above, you have
been placed on probation effective June 5,
2001 and ending July 5, 2001.
Adherence/payment is expected to be
demonstrated immediately and must be followed
throughout the full period and following your
probation.  Additionally, this improvement
must also be sustained following the end of
your probation.  Failure to show improvement
on any of the issues outlines will lead to
further disciplinary action up to and
including termination of your employment.

Please provide the requested documentation by
June 11, 2001 showing all payments you have
made to American Express to satisfy your
personal charges, including any payments made
in 2001.  This documentation should be in the
form of canceled checks and should be sent
via Federal Express to the Region Office.

Note: While you are on Probation, you will be
ineligible for salary increases or
participation in any bonus plans, sales
contests, or travel awards.

6

Ultimately, Ms. Easton elected to resign and accept the

It is our intention to continue to work with you providing guidance and counseling that will help you to bring your performance up to an acceptable level.  While we are willing to provide the support to assist you, at the same time, we want you to know that immediate separation from the company is an option available for your consideration.  If you elect to terminate, you will be eligible for certain company programs including severance which includes 4 weeks of basic pay ($4,808.00) and 8 weeks of supplemental severance ($9,615.00) and benefits in accordance with BMS Severance Pay Policy.

You have 3 business days to decide whether to accept the severance package.  Should you elect the severance option, it will be effective immediately and you will receive 4 weeks of basic severance pay which will be paid in accordance with your normal pay schedule.  You will receive a separate severance letter from Human Resources, requiring you to sign and return within 21 days of the date you receive this probation letter, a General Release in order to receive the 8 weeks of supplemental severance.  Any supplemental severance provided to you will be paid in accordance with your normal pay schedule.

LaShannon, I am available to assist you in improving your administrative functions and other areas needing improvement.  However, the responsibility to meet these program objectives is yours and yours alone.

Please note that in the event the requested documentation is not provided, you will be subject to additional disciplinary action, up to and including termination of employment with Bristol-Myers Squibb.

severance package rather than the probation program.  By letter
dated June 8, 2001, BMS confirmed Ms. Easton's termination from
BMS and her entitlement to the supplemental severance package.[4]
The letter contained a General Release for Ms. Easton's
consideration.  In a section entitled "Attachment II - General
Release," the letter advises Ms. Easton to "read this attachment
carefully, and consult with an attorney and any other advisor of
your choice prior to signing the General Release."  On June 28,
2001, twenty days after receiving the June 8, 2001 letter, Ms.
Easton signed the General Release and accepted the supplemental
severance package.

        Ms. Easton's defamation claim arises out of two
incidents. In the first incident, during a casual encounter
outside a grocery store sometime during the Fall of 2001, Ms.
Easton was reportedly told by Ms. Donna Tucker ("Ms. Tucker"),
another BMS employee, that Ms. Wakin had stated to Ms. Tucker
that Ms. Easton was a "criminal" because she had "a prior felony
conviction."  The second incident occurred during a company
meeting on August 31, 2000.  In this meeting, Ms. Easton alleges
that Ms. Wakin told Ms. Echo Lu ("Ms. Lu"), a BMS Human Resources
representative, and Mr. Matayas that, in essence, Ms. Easton was

---

[4] Although BMS's summary judgment papers do not specify how
Ms. Easton conveyed her decision to resign, the June 8, 2001
states that it was confirming it.  Ms. Easton has not disputed
that she resigned when offered the choice between probation and
resignation plus severance pay.

8

a criminal with a prior felony conviction.


II.  DISCUSSION

     A.  <u>The Standard for Summary Judgment.</u>

_____A court may grant summary judgment only when "the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A fact is "material" only if its
existence or non-existence would affect the outcome of the suit
under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 249 (1986).  An issue of fact is "genuine" only when there
is sufficient evidence from which a reasonable jury could find in
favor of the non-moving party regarding the existence of that
fact.  <u>Id.</u>  In determining whether there exist genuine issues of
material fact, all inferences must be drawn, and all doubts must
be resolved, in favor of the non-moving party.  <u>Coregis Ins. Co.
v. Baratta & Fenerty, Ltd.</u>, 264 F.3d 302, 305-06 (3d Cir. 2001)
(citing <u>Anderson</u>, 477 U.S. at 248).

       Although the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact, in
a case such as this, where the non-moving party is the plaintiff,
and therefore, bears the burden of proof at trial, that party

must present affirmative evidence sufficient to establish the existence of each element of his case.  Id. at 306 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment, see Celotex, 477 U.S. at 324, but rather, she "must go beyond the pleadings and provide some evidence that would show that there exists a genuine issue for trial."  Jones v. United Parcel Service., 214 F.3d 402, 407 (3d Cir. 2000).

B.    The General Release is Valid and Enforceable.

1.    Waiver of claims arising under federal anti-discrimination laws.

In its motion for summary judgment, BMS argues that Ms. Easton waived her right to raise a § 1981 discrimination and state law defamation claim by signing the General Release.[5]

_____

[5] The language of the release provides, in pertinent part:

> By signing this release I am giving up my right to sue the Company, and any affiliates, parent-companies, and subsidiaries, and their past, present and future officers, directors, employees and agents (collectively, the "Released Parties") based upon any act or event occurring prior to my signing this General Release.  Without limitation, I specifically release the Released Parties from any and all claims arising out of my employment and termination, including claims under federal anti-discrimination laws, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, claims for interference with my rights

To be valid, a release must be "knowingly and willfully" made. Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir. 1988).  Whether a release was knowingly and willfully executed depends on the totality of circumstances.  Id. at 524. The Third Circuit teaches that factors relevant in this analysis may include: (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation of the release before signing it; (4) whether plaintiff knew of should have known her rights upon execution of the release before signing it; (5) whether plaintiff was encouraged to seek, or in fact received, the benefit of counsel; (6) whether there was opportunity for negotiation of the terms of the agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled to by law.  Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988).  In this case, consideration of these factors persuades the court that the General Release signed by Ms. Easton is valid and enforceable.

First, the language of the release is clear and unambiguous and is well designed to communicate effectively the

_____

     to benefits under section 510 of the Employee
     Retirement Income Security Act of 1974, and
     any and all federal, state and local laws.

11

consequences of signing the release.  See Cirillo, 862 F.2d at
452 (finding similar release language to be clear and specific).
Specifically, the release advises Ms. Easton that she would be
"giving up [her] right to sue the Company. . .[and its] . .
.employees. . . ."   The Release also provides that "[w]ithout
limitation, [Ms. Easton] specifically release[s] the Released
Parties form any and all claims arising out of [her] employment
and termination, including claims under federal anti-
discrimination laws. . . and any and all federal, state, and
local laws."  In fact, the release makes specific reference to
the very type of claims at issue in this case and indicates in a
very straightforward fashion that Ms. Easton would be "giving up
her right to sue."  Although Ms. Easton argues otherwise, the
mere fact that the language may be boilerplate, i.e., that it was
not specifically drafted with Ms. Easton's claims in mind, does
not detract from its legal significance.

        Second, Ms. Easton is an educated and experienced
business professional.  She is a graduate of Kentucky State
University, where was on the National Dean's List.  Prior to her
position at BMS, Ms. Easton was a sales representative for Eli
Lilly, another large pharmaceutical company, and prior to that,
held a position of responsibility as a Branch Operations Manager
for a bank. In total, Ms. Easton had nearly a decade's worth of
business experience when she signed the release.  There is,

therefore, no suggestion that Ms. Easton was incapable of comprehending the language of the General Release.

Third, after receiving the General Release from BMS on June 8, 2001, Ms. Easton was given twenty-one days to decide whether or not to sign the General Release.  Ms. Easton signed the General Release on June 28, 2001, twenty days after receiving it. Indeed, during these twenty days of deliberation, Ms. Easton spoke with representatives from BMS's Human Resources department and her superiors on at least two separate occasions to clarify the terms of the package and what her options were with respect to the General Release and the severance package. Therefore, there is nothing on the record which suggests that Ms. Easton was rushed by BMS to make a decision or that she was denied the opportunity to meaningfully deliberate on the consequences of executing the General Release.

Fourth, Ms. Easton was expressly afforded the opportunity to consult counsel.[6]  The letter of June 8, 2001 describing the terms of her termination provided that Ms. Easton should "read [the General Release] carefully" and "consult with an attorney and any other advisor of your choice prior to signing the General Release."  Equally clear is the General Release

---

[6] The one time she inquired if she could have an attorney present during discussions about her severance package, she was told by Mr. Kevin McManus of Human Resources that her attorney would have to talk to BMS's attorneys directly.

itself, which provides that "[BMS] has advised me to consult with an attorney and any other advisors of my choice prior to signing this general release."  Thus, Ms. Easton was advised of her right to seek the advice of counsel on two separate documents and each statement is clear and unambiguous.  "Even where a plaintiff does not seek counsel, an express statement regarding his or her right to do so [in the release] satisfies this factor."  <u>Ponzoni v. Kraft General Foods, Inc.</u>, 774 F. Supp. 299, 312 (D.N.J. 1991), <u>aff'd</u>, 968 F.2d 14 (3d Cir. 1992).

Fifth, the consideration given to Ms. Easton in return for the release exceeded that required by the law and the normal policy of BMS.  BMS paid Ms. Easton $9,615 (eight weeks salary) as supplemental severance in addition to $4,808 in basic severance (four weeks salary).  In other words, Ms. Easton received more than what she was entitled to under applicable law and the policy of BMS.  These circumstances do not suggest BMS overreached in the matter.

On the other hand, Ms. Easton suggests that the lack of negotiations is probative of the lack of knowing and voluntarily consent on her part.  She alleges that she broached the idea of changing some terms of her severance package with BMS, but was told that the terms were "not flexible."  Although it is true that the lack of an opportunity to negotiate may be an indicia of lack of knowing and voluntary assent to the terms of the release,

Cirillo, 862 F.2d at 4564 n.4, in this case, it is less relevant because there is nothing on the record that suggests that the "atmosphere surrounding the execution was oppressive." Id.  In other words, that BMS could not accede to changes suggested by Ms. Easton does not, in and of itself, render the otherwise valid release unenforceable.

Ms. Easton also asserts that she was "pressured" to sign the release.  In support, Ms. Easton points to the following excerpt from her deposition:

> Q:   Do you believe that you were pressured
>      to sign the general release that would
>      be giving you the extra eight weeks of
>      severance pay?
>
> A:   Yes, I do believe I was pressured.
>
> Q:   Tell me why.
>
> A:   Because I really did not want to leave
>      BMS.  I really wanted my job back.  I
>      had planned on moving up within the
>      company and staying there.  I really
>      liked what I did and my customers and so
>      forth.  And I felt that because they
>      only gave me a time frame to have it
>      signed or whatever, I didn't even known
>      an attorney to have them review
>      anything.
>
> Q:   Did you have any understanding from
>      either Kevin McManus or Michael D'Fiore
>      that if you didn't sign the general
>      release, that BMS was going to terminate
>      you.
>
> A:   Yes.

* * *

15

Q:   What did they say?

A:   I had not signed this form and I didn't
     want to sign this form, but they
     basically said that if I did not, in so
     many words, sign this form, that after
     my probation was over, I would no longer
     be working with BMS, in so many words,
     is what they basically were saying.

Q:   Did you tell them in this phone
     conversation that you did not want to
     sign the form?

A:   I told them that I did not want to leave
     Bristol-Myers Squibb.

Q:   And what did they say?

A:   I can't exactly recall what their
     response was.

Easton, Dep. Tr., pgs. 186-188.

The court finds no evidence that Ms. Easton signed the
General Release under duress.  Under Pennsylvania law, "where the
contracting party is free to come and go and to consult with
counsel, there can be no duress in the absence of threats of
actual bodily harm." Three Rivers Motor Co. v. Ford Motor Co.,
522 F.2d 885,893 (3d Cir. 1975).  The testimony that Ms. Easton
points to in this regard provides no basis for a finding that any
threats of actual bodily harm were made.  Thus, there is
insufficient evidence to find that she executed the release under
conditions of duress.

Nor does the cited deposition exchange support Ms.
Easton's claim that she was "pressured" into signing the General

16

Release.  To recapitulate, the June 5, 2001 letter from Mr.
Roseboro to Ms. Easton offered her two choices.  One, she could
accept the probationary terms or she could resign and receive
basic severance pay; and two, independent of one, if she
resigned, she had twenty-one additional days to consider
executing a release in exchange for supplemental severance pay.
At best, the cited exchange reflects Ms. Easton's dissatisfaction
with the choice between probation and resignation plus basic
severance ("[b]ecause I really did not want to leave BMS. I
really wanted my job back." Easton, Dep. Tr., pg. 186).  However,
because she signed the General Release at least twenty days <u>after</u>
she had already resigned, her dissatisfaction with the choice
between resignation or probation adds nothing to her contention
that she felt "pressured" to sign the General Release.

Applying the <u>Cirillo</u> factors and under the totality of
circumstances, the court finds that Ms. Easton knowingly and
willfully executed the General Release.  Having failed to raise a
genuine issue of material fact with respect to the validity and
enforceability of the General Release, the court concludes that
Ms. Easton waived her right to assert any claims arising under
"federal anti-discrimination laws" against BMS and its employees.
Accordingly, summary judgment is granted in favor of BMS and Ms.
Wakin on the federal anti-discrimination claim.

2.    <u>Waiver of the state law defamation claim.</u>

17

BMS also asks the court to dismiss the defamation claim against Ms. Wakin based on the General Release that was executed by Ms. Easton.[7]  The General Release provides that Ms. Easton released BMS and its employees from "any and all claims arising out of my employment and termination" including "any and all" arising under "state. . .and local laws."  However, the General Release, by its own terms, specifically stated that "I am NOT releasing any claims that may arise after the date I sign this General Release."  This exception in the General Release comports with the doctrine that releases are strictly construed so as not to bar the enforcement of a claim which had not accrued at the date of the execution of the release. See Three Rivers Motors Co., 522 F.2d at 896; see also Youngren v. Presque Isle Orthopedic Group, Inc., 876 F. Supp. 76, 79 (W.D. Pa. 1995); Jordan v. Smithkline Beecham, Inc., 958 F. Supp. 1012, 1019 (E.D. Pa. 1997). Under Pennsylvania law, a cause of action for defamation accrues on the date of publication of the defamatory

---

[7] In Coventry, the Third Circuit rejected applying ordinary contract principles to waiver of claims arising under federal anti-discrimination laws, specifically the Age Discrimination in Employment Act (ADEA). 856 F.2d at 522.  In doing so, the court recognized that the test for waiver under contract principles was less rigorous than that applicable to the ADEA. Thus, a release sufficient to waive federal anti-discrimination claims necessarily waives state claims under contract law. See, e.g., Mullen v. New Jersey Steel Corp., 733 F. Supp. 1534, 1548 (D.N.J. 1990).  Because the General Release was valid to effectuate a waiver of Ms. Easton's federal anti-discrimination claim, it is also valid to effectuate a waiver of Ms. Easton's state law claims.

statements.  <u>Barrett v. Catacombs Press</u>, 64 F. Supp. 2d 440, 443 (E.D. Pa. 1999).

Ms. Easton alleges that Ms. Wakin published a defamatory statement in the presence of Ms. Tucker at a meeting in Philadelphia in November 2000.  Ms. Easton also alleges that a defamatory statement was published by Ms. Wakin in the presence of herself, Mr. Matayas and Ms. Lu during the meeting of August 31, 2000.  In both cases, the alleged publication took place prior to the execution of the General Release; therefore, the cause of action for defamation accrued prior to the execution of the General Release. Because the cause of action for the alleged defamation accrued before the execution of the General Release, Ms. Easton is barred by the General Release from asserting this claim against Ms. Wakin.  Accordingly, summary judgment in favor of Ms. Wakin is appropriate.[8]

---

[8] Nothwithstanding the enforceability of the General Release, summary judgment is proper on Ms. Easton's defamation claim against Ms. Wakin.  Under Pennsylvania law, in an action for defamation, Ms. Easton must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to her; (4) the understanding by the recipient of its defamatory meaning; and (5) an understanding of the reader or listener of an intent by the defendant that the statement refers to her.  <u>Miketic v. Baron</u>, 450 Pa. Super. 91, 97, 675 A.2d 324, 327 (1996); 42 Pa.Cons.Stat.Ann. § 8343(a)(1-5)(1988). Special damages need not be proven when the alleged statement is defamatory per se, i.e., it contains words imputing criminal offense, loathsome disease, business misconduct, serious sexual misconduct.  <u>Okocci v. Klein</u>, 270 F. Supp. 2d 603, 615 (E.D. Pa. 2003).

With respect to Ms. Easton's encounter with Ms. Tucker

outside the grocery store, Ms. Easton has failed to provide any
testimony from Ms. Tucker, the reported recipient of the alleged
defamatory statement.  The only evidence Ms. Easton provides is
her own assertion that Ms. Tucker told her that defendant had
made defamatory statements.  To the extent that this evidence is
based on hearsay, it is inadmissible and cannot be relied upon to
overcome a summary judgment motion.  See Burch v. WDAS AM/FM,
2002 U.S. Dist. LEXIS 12290 *38 (E.D. Pa. Jun. 28, 2002)
(granting summary judgment on a defamation claim because the only
evidence of publication was hearsay evidence); Stewart v.
Florence Nightingale Health Cntr., 1999 U.S. Dist. LEXIS 3985 *30
(S.D.N.Y. Mar. 31, 1999)(same).

    Ms. Easton also contends that, during the meeting on August
31, 2000, Ms. Wakin told Ms. Lu and Mr. Matayas that she was a
criminal with a prior felony conviction.  In its motion for
summary judgment, BMS argues that Ms. Wakin had a conditional
privilege to publish statements about Ms. Easton's criminal
background.  The court agrees.

    A conditional privilege exists when (1) an interest of the
publisher of the defamatory statement is implicated; (2) an
interest of the recipient of the defamatory statement or that of
a third party is implicated; or (3) a recognized public interest
is implicated. Miketic, 675 A.2d at 327.  A person who publishes
a conditionally privileged defamatory statement is protected from
liability unless he or she has abused the privilege.  Id. at 329.

    From the record, it is apparent that the August 31, 2000
meeting was called after BMS had obtained Ms. Easton's background
check, which showed a previous felony conviction.  The purpose of
the meeting was to discuss the background check and provide Ms.
Easton with an opportunity to explain the conviction and to
determine whether or not she had lied or made misrepresentations
on her employment application.  Present at this meeting were Ms.
Easton, Ms. Lu of BMS's Human Resources department and Mr.
Matayas, Ms. Easton's direct supervisor, i.e., people in BMS's
management team in a position to discipline Ms. Easton in the
event the background check was true. As such, only people whose
interests were implicated were present.  Thus, Ms. Wakin
statements about Ms. Easton's criminal history were protected by
a conditional privilege.  The conditional privilege, often
referred to as the "common interest" privilege, is regularly
applied to such intra-organizational communications concerning
employees.  See, e.g., Giusto v. Ashland Chem. Co., 994 F. Supp.
587, 593 (E.D. Pa. 1998)(finding that defendant's communications

III. CONCLUSION

In view of the forgoing analysis, summary judgment is granted in favor of BMS and Ms. Wakin as to plaintiff's discrimination on the basis of race claim and defamation claim.

An appropriate order follows.

---

to plaintiff's employer were conditionally privileged because "they involved workplace communications regarding a subject matter of common interest."); Maier v. Maretti, 448 Pa.Super 276, 285-86, 671 A.2d 701 (1995), 706; Daywalt v. Montgomery Hosp., 393 Pa.Super. 118, 123-24, 573 A.2d 1116, 1118-9 (1990).

Ms. Easton does not allege that Ms. Wakin abused her conditional privilege.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
LASHANNON J.  EASTON,           :       CIVIL ACTION
                                :       NO. 02-3695
          Plaintiff,            :
                                :
          v.                    :
                                :
BRISTOL-MYERS SQUIBB COMPANY    :
          and                   :
BRENDA MARTINI WAKIN,           :
                                :
          Defendants.           :
                                :
```

ORDER

**AND NOW**, this   day of **October 2003**, for the reasons
set forth in the accompanying memorandum, it is hereby **ORDERED**
that defendants' motion for summary judgment (doc. no. 7) is
**GRANTED**.


          **AND IT IS SO ORDERED.**


                              _____
                              **EDUARDO C. ROBRENO, J.**